**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

_____

|  |  |  |
|---|---|---|
| LANXESS CORPORATION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Court No. 23-00073 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

_____

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S RESPONSE TO THE UNITED STATES' CROSS MOTION FOR SUMMARY JUDGEMENT**

Kenneth G. Weigel
Brian Frey
Lian Yang
Robert Hawes
ALSTON & BIRD LLP
950 F St N.W.
Washington D.C. 20004
(202) 239-3490
Brian.Frey@alston.com
*Counsel to LANXESS*

Dated: October 31, 2025

# TABLE OF CONTENTS

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................... 1

II.   FACTS ................................................................................................................. 3

III.  TARIFF PROVISIONS AT ISSUE ................................................................................... 5

IV.  DISCUSSION ......................................................................................................... 7

    A.  CA 1330 is not "consumed" in the polymerization process........................................... 8

    B.  CA 1330 falls under heading 3815 pursuant to GRI 1 and 2(A)................................... 10

       1.    GRI 2(a) applies to heading 3815, HTSUS……………………………………11

       2.    CA 1330 has the essential character of an article of heading 3815, HTSUS….13

    C.  The Government's definition of a "reaction accelerator" is unnecessarily limited. ..... 15

    D.  CA 1330 is specifically classified at subheading 3815.19.00. ..................................... 17

    E.  The Court should not allow the Government to amend its complaint to add a counterclaim or defense. ........................................................................................... 19

       1.    The Government's effort to add a new counterclaim or defense at this late stage of the litigation is untimely……………………………………………………19

       2.    The Court cannot order the duty payment that the Government seeks………..20

V.   CONCLUSION ..................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Avecia, Inc. v. United States*,
    30 C.I.T. 1956 (Ct. Int'l Trade 2006) .............................................................................11, 12

*Cummins Engine Co. v. United States*,
    23 CIT 1019 (Ct. Int'l Trade 1999) ...................................................................................13

*Cyber Power Sys. (USA) Inc. v. United States*,
    586 F. Supp. 3d 1325 (Ct. Int'l Trade 2022) .......................................................................21

*Degussa Corp. v. United States*,
    508 F.3d 1044 (Fed. Cir. 2007).........................................................................................17

*E.M. Chemicals v. United States*,
    920 F.2d 910 (Fed. Cir. 1990)..........................................................................................10

*FANUC Robotics Am., Inc. v. United States*,
    393 F. Supp. 3d 1254 (Ct. Int'l Trade 2019) .......................................................................11

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000).........................................................................................................15

*Gwazdavsaks v. Tharp*,
    2020 U.S. Dist. LEXIS 104298 (W.D. Va. June 16, 2020) ...................................................19

*Maple Leaf Mktg., Inc. v. United States*,
    639 F. Supp. 3d 1363 (Ct. Int'l Trade 2023) .......................................................................21

*Motorola, Inc. v. United States*,
    436 F.3d 1357 (Fed. Cir. 2006).........................................................................................17

*Pomeroy Collection, Ltd.*,
    32 C.I.T. at 537–41 .........................................................................................................12

*Pomeroy Collection, Ltd. v. United States*,
    32 C.I.T. 526 (Ct. Int'l Trade 2008) .............................................................................12, 13

*Sea-Land Service, Inc. v. U.S.*,
    239 F.3d 1366 (Fed. Cir. 2001).........................................................................................22

*Second Nature Designs, Ltd. v. United States*,
    654 F. Supp. 3d 1301 (Ct. Int'l Trade 2023) ....................................................................3, 21

*Tomoegawa (U.S.A), Inc. v. United States*,
    15 C.I.T 182 (Ct. Int'l Trade 1991) ........................................................................19, 20

*Whitest v. Crisp. Cnty Ga. Bd. of Educ.*,
    2021 U.S. Dist. LEXIS 192353 (M.D. Ga. Aug. 20, 2021) .....................................19

*Zenith Radio Corp. v. United States*,
    823 F.2d 518 (Fed. Cir. 1987) .................................................................................19

**RULES**

USCIT Rule 1 ...................................................................................................................19

USCIT Rule 13 .................................................................................................................19

USCIT Rule 13(e) ..............................................................................................................3

USCIT Rule 15 .................................................................................................................19

USCIT Rule 15(a) ..........................................................................................................3, 19

USCIT Rule 15(a)(2) .......................................................................................................19

USCIT Rule 56.3(c) ...........................................................................................................2

USCIT Rule 8(d) ...........................................................................................................3, 19

USCIT Rule 81 ...................................................................................................................2

**STATUTES**

19 U.S.C. 1315(d) ............................................................................................................22

19 U.S.C. 1625 .........................................................................................................3, 21, 22

19 U.S.C. 1625(c) ............................................................................................................22

HTSUS Heading 3815 ............................................................................................... passim

HTSUS Heading 3824 ............................................................................................... passim

HTSUS Heading 9405 .......................................................................................................12

**OTHER AUTHORITIES**

19 C.F.R. 152.16 ..............................................................................................................23

19 C.F.R. 152.16(c) ..........................................................................................................23

19 C.F.R. 177.10(c)................................................................................................22

19 C.F.R. 177.10(e)................................................................................................22

19 C.F.R. 177.12 ....................................................................................................22

19 C.F.R. 177.12(d)(iv)..........................................................................................22

19 C.F.R. 177.12(e)(2)(ii) ......................................................................................22

Abstract, PATTY'S TOXICOLOGY, https://doi.org/10.1002/0471125474.tox024.pub3 .................15

ACCELERATOR, *Merriam Webster, available at*
  https://www.merriamwebster.com/dictionary/accelerator#:~:text=%3A%20a%20subs
  tance%20that%20speeds%20a%20chemical%20reaction ........................................11

CATALYTIC, *Cambridge Dictionary*,
  https://dictionary.cambridge.org/us/dictionary/english/catalytic (last visited Oct. 29,
  2025) .........................................................................................................................11

H.R. Rep. No. 103-361 (1993), *reprinted in* 1993 U.S.C.C.A.N. 2551 ........................22

CONSUME, *Merriam-Webster Dictionary*, https://www.merriam-
  webster.com/dictionary/consume (last visited October. 28, 2025)..........................8

PREPARATION, *Merriam Webster*, https://www.merriam-
  webster.com/dictionary/preparation (last visited October 29, 2025).......................11

REACTION, *Britannica.com, available at* https://www.britannica.com/question/What-
  are-the-basics-of-chemical-reactions (last visited September 24, 2025) ................11

**RULINGS**

HQ 554581 (July 2, 1987) ......................................................................................13

HQ 952077 (Feb. 23, 1993) ....................................................................................13

HQ 956226 (Sep. 13, 1994) ....................................................................................14

HQ H192517 (Nov. 24, 2014) ..................................................................................7

NY N300749 (Oct. 18, 2018) ..................................................................................13

New York Ruling Letter (NY) N128896 (November 10, 2010) ...............................21

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

This case concerns the proper classification of Axion CA 1330 ("CA 1330"). CA 1330 is produced, sold, and used exclusively as a supported catalyst. Accordingly, LANXESS submits that, because it is not specified elsewhere in the tariff schedule, it should be classified as a "reaction accelerator" or "catalytic preparation" under heading 3815, Harmonized Tariff Schedule of the United States ("HTSUS"), and, more specifically, as a "supported catalyst" under item 3815.19.0000, HTSUS. In this respect, the language of heading 3815, HTSUS, must be interpreted in accordance with the World Customs Organization Explanatory Notes to the Harmonized Tariff Schedule (2022) ("EN" or "Explanatory Notes"); its language should not be limited in scope as the Government suggests. However, even if the tariff language were to be defined as suggested by the Government, then, by applying General Rule of Interpretation ("GRI") 2(a) to heading 3815, HTSUS, that heading 3815 covers incomplete and unfinished reaction accelerators such as CA 1330.

The Government asserts legally flawed arguments as to the proper interpretation of heading 3815 and item 3815.90.0000, HTSUS, so as to preclude CA 1330 from this classification. Principally, the Government proffers narrow definitions of "reaction accelerator" and "catalyst preparation," claiming that they should be interpreted such that only complete and active supported catalyst systems are classified under heading 3815, HTSUS. Indeed, according to the Government, to be classified in heading 3815, HTSUS, the imported merchandise must have an active catalytic center at the time of importation. Such an interpretation renders the tariff provision meaningless in the commercial context of catalysts for olefin polymerization and is contrary to the Explanatory Notes.

Assuming, arguendo, that the Government was correct as to its interpretation of the tariff terms—which it is not—the Government then argues that GRI 2(a) does not apply to the classification of CA 1330, both as a matter of law and because CA 1330 is a finished commercial product. This argument fails, however, because: (1) the Government's claim that GRI 2(a) does not apply to heading 3815, HTSUS, is incorrect as a matter of law; and (2) the Government concedes that CA 1330 is an unfinished product that is only used in a two-part catalyst system. Memorandum in Support of Defendant's Cross Motion for Summary Judgement ("Def. Br.") at 12. The facts establish that CA 1330 has the essential character of a complete catalyst system, more specifically of a supported catalyst system, at the time of importation. The Government also claims that CA 1330 is not a catalyst because it claims, incorrectly, that it is "consumed" during the polymerization reaction. This is demonstrably false, as clearly evidenced by the facts and literature.[1] Plaintiff's Statement of Material Facts as to which there is no Genuine Issues to be Tried at ¶ 36 ("Statement of Material Facts"); Att. 1, Supplemental Declaration of Michael Krause ("Krause Supp. Decl.") at ¶¶ 6–7.

Finally, LANXESS objects to the Government raising a counterclaim or defense in its summary judgement motion. U.S. Customs and Border Protection ("CBP") classified CA 1330 under item 3802.90.9000, HTSUS, based on a binding ruling issued to the former producer of CA 1330, which LANXESS purchased. The Government has conceded that this ruling is wrong, and now in its motion attempts to assert a counterclaim or defense that CA 1330 is properly classified

---

[1] This is one of several incorrect factual statements the Government makes in their Statement of Materials Facts not in Genuine dispute. To rebut these positions, LANXESS has filed a response to these facts pursuant to CIT Rules 56.3(c) and 81. Confidential Attachment 1, Plaintiff's Response to Defendant's Statement of Material Facts Not in Dispute. LANXESS also filed with this brief a supplemental declaration for Michael Krause to clarify factual positions that LANXESS asserts in its Statement of Material Fact Not in Genuine Dispute. *See* Krause Supp. Decl.

under item 3824.99.28,[2] HTSUS. This attempt is both procedurally improper and substantively impermissible. Counterclaims and defenses must be raised in the answer. USCIT R. 8(d); USCIT R. 13(e); USCIT R. 15(a). The answer failed to raise this issue. *See generally* Dkt. 14. Moreover, the Court should not allow the Government over two years into the litigation, after discovery has closed, and in the midst of dispositive motion practice, to amend its pleadings to add a counterclaim or defense. Also, as the Government seems to concede, although counterclaims are allowed in the CIT, the CIT has held in multiple cases that there is no legal basis for the Government to assert a counterclaim in a tariff classification dispute; an alternative classification must be raised as a defense. *See generally Second Nature Designs, Ltd. v. United States*, 654 F. Supp. 3d 1301 (Ct. Int'l Trade 2023). Moreover, because this litigation is in response to a classification decision based on binding CBP ruling, the Government is clearly prohibited by statute from collecting additional duties based on any higher tariff rate than the rate assigned in the ruling. *See* 19 U.S.C. 1625 (describing the process CBP must follow to modify a ruling).

## II.    FACTS

LANXESS submits that the parties have agreed on the facts necessary for the court to classify CA 1330 once the Court interprets the applicable law. The only disputed material fact is whether CA 1330 is consumed in the polymerization reaction, but Dr. Michael Krause and the literature are clear that the Government's claim that CA 1330 is consumed in the polymerization reaction is clearly wrong. Statement of Material Facts at ¶ 36; Krause Supp. Decl.at ¶¶ 6–7.

---

[2] We assume that the Government's citation to item 3824.99.28, HTSUS, is an error, as that tariff provision no longer exists. We therefore presume that the Government is actually proposing item 3824.99.29, HTSUS, and will refer to that tariff item herein.

CA 1330 is a solution consisting of a mixture in liquid form of methylaluminoxane ("MAO")[3] and trimethylaluminum ("TMA"), in toluene with rough approximate percentages of 50-70% toluene, 30-50% MAO, and 1-5% TMA by weight. Statement of Material Facts at ¶ 7. The toluene is necessary for the MAO to be used as a catalyst. Att. 3 to Plaintiff's Motion for Summary Judgement, Declaration of Michael Krause ("Krause Decl.") at ¶ 13. CA 1330 is specially made to customer specifications for use in the customer's catalyst system; as such CA 1330 is a catalytic preparation. The only use of CA 1330 is as a catalyst (reaction accelerator) in the production of polyolefins; it is the main active ingredient in a supported catalyst system. *Id.* at ¶¶ 16–17. Specifically, LANXESS's customers add a small amount of a metallocene of their selection and an inert support (silica gel) to the Axion CA 1330 solution and remove the toluene; then this catalyst system is introduced into the reactor to transform olefins to polyolefins. *Id.* at ¶¶ 28–29.

CA 1330 is designed for and exclusively used as the essential ingredient in a supported catalyst system for olefin polymerizations. *Id.* at ¶¶ 37–38. CA 1330 has no use other than as the main part of a catalyst system accelerating an olefin polymerization reaction. *Id.* at ¶ 38. Although CA 1330 is a finished product from the perspective of a catalyst system component, it is the component that provides the essential character of an MAO-metallocene supported catalyst system. The MAO-metallocene catalyst system uses several components: CA 1330 (mainly its MAO content), a metallocene selected by the polyolefin producer), and a support, which is normally silica. *Id.* at ¶ 27. CA 1330 and metallocene work together to function as the catalyst. *Id.*

---

[3] MAO is a mixture of organoaluminium compounds with the approximate formula $[0_x\text{-Al-Me}_y]_n$ as the amount of oxygen, and methyl groups and the types of MAO vary. (Me is a methyl group, with the formula -CH$_3$.) The different oligomers of MAO vary in size and stoichiometry. Most, but not all, of the components of MAO have not been unambiguously identified. Krause Dec at 9

at ¶ 35. The silica gel is needed to increase the surface area of the catalyst to avoid determinantal reactions in a gas phase reaction. *Id.* at ¶ 32. Polyolefin producers provide specifications for the levels of MAO and TMA in their CA 1330 and select the metallocene for the catalyst system based on the properties desired in the polyolefin that is being produced. Att. 2 to Plaintiff's Motion for Summary Judgement, Deposition of Michael Krause ("Krause Dep.") at 54:13-55:2.

The CA 1330 donates a methyl group to the metallocene and acts as an anion (negatively charged molecule) to the metallocene cation (positively charged molecule). This anion-cation pair creates the catalytic center of the catalyst system. Krause Decl. at ¶ 37. CA 1330 creates a positively charged metallocene molecule that serves as a base for polymer chains to form. Id.; Krause Supp. Decl. at ¶ 4. CA 1330's role is then to maintain charge balance with the positively charged metallocene. The positively charged metallocene is where ethylene inserts into the polymer chain, making the polymer chain longer. *Id.* Eventually, a hydrogen atom is transferred from the growing polymer chain back to the metallocene, which simultaneously releases the polymer molecule. *Id.* The metallocene is still a cation (positively charged), and the "vacant site" can continue to polymerize ethylene molecules which starts the synthesis of a new polymer chain. *Id.*

This matter began when LANXESS thought CA 1330 was misclassified, as LANXESS considered it a supported catalyst. CA 1330 is known as a supported catalyst because of its exclusive and important role as a reaction accelerator. LANXESS knows a competitive product is exported by U.S. producers classified as a supported catalyst. Krause Decl. at ¶ 19.

## III.    TARIFF PROVISIONS AT ISSUE

Initially there were two tariff provisions at issue in this case.

The Government denied a protest and classified CA 1330 under item 3208.90.00, HTSUS:

| 3208 | | Paints and varnishes (including enamels and lacquers) based on synthetic polymers or chemically modified natural polymers, dispersed or dissolved in a nonaqueous medium; solutions as defined in note 4 to this chapter: | | | |
|---|---|---|---|---|---|
| 3208.10.00 | 00 | Based on polyesters.................................................... | liters.......... kg | 3.7%[1] | |
| 3208.20.00 | 00 | Based on acrylic or vinyl polymers.................................... | liters.......... kg | 3.6%[1] | |
| 3208.90.00 | 00 | Other................................................................ | liters.......... kg | 3.2%[1] | |

In the protest and in this litigation, LANXESS has argued CA 1330 is classified under item 3815.19.00, HTSUS:

| 3815 | | Reaction initiators, reaction accelerators and catalytic preparations, not elsewhere specified or included: Supported catalysts: | | |
|---|---|---|---|---|
| 3815.11.00 | 00 | With nickel or nickel compounds as the active substance[2]................................................ | kg.............. | Free[1] |
| 3815.12.00 | 00 | With precious metal or precious metal compounds as the active substance............................... | kg.............. | Free[1] |
| 3815.19.00 | 00 | Other[2]............................................................ | kg.............. | Free[1] |
| 3815.90 | | Other: Consisting wholly of inorganic substances: | | |
| 3815.90.10 | 00 | Of bismuth, of tungsten or of vanadium.................. | kg.............. | 6.5%[1] |
| 3815.90.20 | 00 | Of mercury or of molybdenum.......................... | kg.............. | 2.8%[1] |
| 3815.90.30 | 00 | Other.................................................. | kg.............. | Free[1] |
| 3815.90.50 | 00 | Other.................................................. | kg.............. | 5%[1] |

Now, the Government is asserting that CA 1330 is classified in the chemicals basket provision item 3824.99.29, HTSUS:



| 3824 (con.) | Prepared binders for foundry molds or cores; chemical products and preparations of the chemical or allied industries (including those consisting of mixtures of natural products), not elsewhere specified or included: (con.) | | |
| 3824.99 (con.) | Other: (con.)<br>Other: (con.) | | |
| 3824.99.29 | 00 | Other................................................. | kg.............. | 6.5%[1] |

## IV.   DISCUSSION

Contrary to the Government's assertion, heading 3815, HTSUS, specifically subheading 3815.19.00, is the proper classification based on a proper interpretation and application of the law because CA 1330 is a "reaction accelerator" or "catalytic preparation" as those terms are used in heading 3815, HTSUS. And, within heading 3815, HTSUS, CA 1330 is best described as a "supported catalyst. The Government's arguments to the contrary are based on: (1) a mistaken factual assumption that CA 1330 is "consumed" in the polymerization process, which it is not; (2) a misinterpretation of heading 3815, HTSUS; and (3) a misapplication of GRIs 1 and 2(a). We address these issues below. In addition, the Government has attempted to implicitly amend its complaint by attempting to assert for the first time in its motion a counterclaim or defense that CA 1330 is properly classified under item 3824.99.29, HTSUS. That attempt is both procedurally improper and substantively incorrect, and the counterclaim or defense should be disallowed.

We note for the sake of completeness that the Government's argument that GRI 1 instructs that CA 1330 is classified under heading 3824, HTSUS is nonsensical. Heading 3824, HTSUS, is a catchall basket provision, so its terms cover *all* products of the chemical industry. However, chemical industry products are classified there ***only if the product does not fit anywhere else*** in

the tariff schedule. *See* HQ H192517 (Nov. 24, 2014) ("Heading 3824, HTSUS, is a basket provision . . . if the subject merchandise can be more specifically classified elsewhere in the tariff, it is precluded from classification in heading 3824, HTSUS, even if it meets the terms of the heading.") Accordingly, the Government's application of GRI 1 suggests a fundamental misunderstanding of how GRI 1 is to be used. The Government's GRI 1 argument that heading 3824, HTSUS, covers CA 1330 can therefore be dismissed out of hand and will not be discussed further in this brief. The sole issue before the Court is whether another heading besides heading 3824, HTSUS applies to CA 1330.

Finally, we note that LANXESS agrees with the Government that, despite the existence of the binding ruling, CA 1330 is not properly classified under item 3208.90.9000, HTSUS. Def. Br. at 9. Thus, given that there is no dispute that that classification is not correct, we will not address that tariff provision further in this brief.

### A.   CA 1330 is not "consumed" in the polymerization process.

The Government's claim that the MAO in CA 1330 is "consumed" in the polymerization process and that it is therefore precluded from classification as a catalyst is factually incorrect. Def. Br. at 5, 17–19. This allegation seems to presume (incorrectly) that the polymerization process requires CA 1330 to continually activate the metallocene and that such reactivation continues until the CA 1330 is fully consumed. This allegation is factually incorrect.

"Consumed" means "to do away with completely." *See* "Consume," *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/consume (last visited October. 28, 2025). Because CA 1330 only loses a miniscule portion of its MAO's atomic mass and activates the metallocene once for the catalyst to work, CA 1330 is not consumed in either making the catalyst or in polymerizing the olefin.

CA 1330 is mainly composed of MAO, and MAO has many (but an ill-defined number of) methyl groups. Statement of Material Facts at ¶ 11. Indeed, the number of methyl groups in MAO varies as evidenced by its chemical formula $[0_x\text{-Al-Me}_y]_n$. Statement of Material Facts at ¶ 11; Note 3 *supra*. When combined with a metallocene, the MAO activates the metallocene by ultimately donating one methyl group to the metallocene. Krause Decl. at ¶ 37(a); Krause Supp. Decl. at ¶ 5. Once activated, the metallocene has a catalytic center that causes continuous polymerization. Krause Decl. at ¶ 37(a); Krause Supp. Decl. at ¶ 4. MAO has an indefinite number of methyl groups, and it loses only one in the metallocene activation process. Statement of Material Facts at ¶¶ 35(i)–(ii); 36; Krause Supp. Decl. at ¶ 6. Even after losing one methyl group to the metallocene, MAO is still chemically MAO. In these catalytic systems, the ratio of methyl groups to metallocene ranges from 160 to 340. Krause Decl. at ¶ 9; Krause Supp. Decl. at ¶ 7. Saying that losing one methyl group "consumes the MAO" is like saying that taking a glass of water out of the Colorado River is "consuming" the entire river. In addition, it is relevant to note that, contrary to the Government's assertion, MAO loses the methyl group to create the catalyst, not the polymer.

Second, the polymerization reaction terminates when there is a hydrogen transfer from the growing polymer chain back to the metallocene, which simultaneously releases the polymer molecule, not because the MAO has no more methyl groups to provide. Krause Decl. at ¶ 37. MAO only loses one methyl group in the metallocene activation phase and remains a positively charged cation to balance the negatively charged anion metallocene, thus maintaining the catalytic center of the metallocene. Statement of Material Facts at ¶¶ 35(i) –(iii), 36; Krause Decl. at ¶ 37(a). There is no reactivation of the metallocene that occurs during the polymerization process. Krause Suppl. Decl. at ¶ 4. The polymerization reaction terminates when there is a hydrogen transfer from the growing polymer chain back to the metallocene, which simultaneously releases the polymer

molecule. Krause Decl. at ¶ 37. At the end of the polymerization reaction, the MAO in CA 1330 still exists basically as it did before. Ultimately, like all catalyst systems, it becomes inactive, but this is not because the CA 1330 is consumed. Krause Decl. at ¶ 37(a). Thus, as CA 1330 is not consumed in the polymerization reaction, it satisfies that definition of a catalyst.

**B.    CA 1330 falls under heading 3815 pursuant to GRI 1 and 2(A).**

In its Motion for Summary Judgement, LANXESS explained why CA 1330 is a reaction accelerator (more specifically, a supported catalyst system). *See* LANXESS Br. at 9–16. The Government's argument to the contrary incorrectly interprets the language of heading 3815, HTSUS. The Government also incorrectly contends that LANXESS "completely skips GRI 1 in its analysis" because "[t]he term 'supported catalyst' does not appear in the [h]eading 3815, HTSUS." Def. Br. at 12. The Government misunderstands LANXESS's argument entirely. LANXESS does not ask the Court to skip GRI 1 in its analysis. Rather, as explained in LANXESS's opening brief, at the heading level, and using GRI 1 ***and*** 2(a), CA 1330 should be classified under heading 3815, HTSUS, because it is a "reaction accelerator." Moreover, CA 1330 would appear to meet the definition of a "catalytic preparation" in heading 3815, HTSUS.

GRI 1 requires that articles be classified according to the terms in the headings. GRI 1, HTSUS. GRI 2(a) explains that any of the terms in the headings include unfinished versions of the articles that the heading describes, provided that the unfinished article has the essential character of the finished article. GRI 2(a), HTSUS. Heading 3815 covers "[r]eaction initiators, reaction accelerators and catalytic preparations." As these terms are not defined in the HTSUS, they are interpreted in accordance with their commercial and common meaning. *See E.M. Chemicals v. United States*, 920 F.2d 910, 913 (Fed. Cir. 1990) ("[t]ariff terms are to be construed in accordance

with their common and popular meaning, in the absence of a contrary legislative intent."[4]). A chemical reaction "rearranges the constituent atoms of the reactants to create different substances. . . ." REACTION, *Britannica.com, available at* https://www.britannica.com/question/What-are-the-basics-of-chemical-reactions (last visited September 24, 2025). An accelerator is "a substance that speeds a chemical reaction" ACCELERATOR, *Merriam Webster, available at* https://www.merriamwebster.com/dictionary/accelerator#:~:text=%3A%20a%20substance%20th at%20speeds%0a%20chemical%20reaction. Therefore, a "reaction accelerator" refers to a substance that speeds the rate of a chemical reaction. A catalytic preparation is a substance that is prepared for use as a catalyst. CATALYTIC, *Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/catalytic (last visited Oct. 29, 2025); PREPARATION, *Merriam Webster*, https://www.merriam-webster.com/dictionary/preparation (last visited October 29, 2025). Furthermore, by application GRI 2(a), the terms of heading 3815, HTSUS, include unfinished articles that have the "essential character" of a good that accelerates reactions or is a catalytic preparation.

### 1. GRI 2(a) applies to heading 3815, HTSUS.

In its GRI 1 analysis, the Government ignores the statute when it claims that GRI 2(a) does not apply to Chapter 38, HTSUS. Def. Br. at 20-21. The GRIs are in a headnote to the entire HTSUS. *FANUC Robotics Am., Inc. v. United States*, 393 F. Supp. 3d 1254, 1260 (Ct. Int'l Trade 2019). Thus, the statute instructs that GRI 2(a) applies to all tariff provisions. The Government's claim to the contrary is based solely on a statement in the Explanatory Notes:"[i]n view of the scope of the headings of Sections I to VI of the HTSUS, this part of the Rules does not normally apply to goods of these Sections." Explanatory Notes GRI 2(a). As this Court has explained in the

---

[4] As discussed below, the Explanatory Notes suggest a broad interpretation of the terms of heading 3815, HTSUS, to cover products used only in a catalyst by providing the Ziegler – Natta example.

GRI 2(a) context, however, "normally" does not mean "not ever." *Avecia, Inc. v. United States*, 30 C.I.T. 1956, 1986 (Ct. Int'l Trade 2006) ("[G]enerally speaking, whether GRI 2(a) is applicable to a particular product is a function of the type of product, and many products of Section VI of the HTSUS are simply not susceptible to being 'unfinished' products because in their unfinished condition they are fundamentally different goods."); *Id.* at 1987. Heading 3815, HTSUS, enumerates a list of products, and such products may clearly be unfinished at the time of importation.

LANXESS's approach of utilizing both GRI 1 and 2(a) also comports with how the Court has applied GRI 1 and GRI 2(a) to the terms in a heading. For example, in *Pomeroy Collection*, the court ruled that an unassembled article fell under HTS heading 9405 because of GRI 2(a). *Pomeroy Collection, Ltd. v. United States*, 32 C.I.T. 526 (Ct. Int'l Trade 2008) The *Pomeroy* Court applied GRI 1 and 2(a) to classify unassembled candle holders under HTSUS heading 9405, even though, post importation, the customer had to add in sand and stones so that the article could hold a candle. *Pomeroy Collection, Ltd.*, 32 C.I.T. at 537–41. The Court, discussing GRI 1, explained that "first the step in any classification analysis is to determine whether the headings and notes require a particular classification." *Id.* at 536. However, to reach its conclusion that the subject merchandise should be classified under heading 9405, the Court also had to resort to GRI 2(a). *Id.* at 537. The Court explained that, because of GRI 2(a), heading 9405 covers fully assembled lamps, and also unassembled candle lamps, provided that the import has the essential character of a complete candle lamp. *Id.*

While the *Pomeroy* Court ruled that the candle holder should be classified under heading 9405 because it is a candle holder that is dissembled, the Court's analysis is relevant to CA 1330. Unlike the article in *Pomeroy*, CA 1330 is an incomplete article with the essential character of an

article listed under an HTS heading. *Pomeroy Collection*, Ltd. at 32 C.I.T. at 537–41. Regardless of whether the article is an unassembled but complete good or an unfinished article, *Pomeroy* demonstrates how GRI 1 and 2(a) interact with one another.[5]

Here, LANXESS's GRI 1 analysis necessarily involves GRI 2(a). As relevant hereto, heading 3815, HTSUS, covers "reaction initiators, reaction accelerators and catalytic preparations."[6] Then, GRI 2(a) instructs that these terms in heading 3815, HTSUS, also cover their unfinished component parts, assuming that they have the essential character of the finished article. Applying the *Pomeroy* Court's analysis, since CA 1330 has the essential character of a "reaction accelerator," the Court should classify CA 1330 under heading 3815.

### 2. CA 1330 has the essential character of an article of heading 3815, HTSUS.

CA 1330 has the essential character of a reaction accelerator. CA 1330 is a mixture in liquid form consisting of between 50-70% toluene (CAS No.108-88-3), between 30-50% methylaluminoxane (CAS-No 308062-01-3) ("MAO"), and between 1-5% of trimethylaluminum ("TMA"). Statement of Material Facts at ¶ 7. After importation, customers add a metallocene of their choice and a support, normally silica gel, to CA 1330 and remove the toluene to create a supported catalyst to accelerate the polymerization of olefins. Statement of Material Facts at ¶¶ 28–29.

---

[5] The *Pomeroy* court is not alone in applying GRI 2(a) to apply the terms of a heading to include their unassembled or unfinished counterparts. *See, e.g. Cummins Engine Co. v. United States*, 23 CIT 1019, 1022–31 (Ct. Int'l Trade 1999) (ruling that an unfinished crankshaft was classifiable under subheading 8483.10.30 because per GRI 2(a), this heading also included unfinished crankshafts). Similarly, U.S. Customs and Border Protection ("CBP") itself routinely applies GRI 2(a). *See* HQ 952077 (Feb. 23, 1993) (ruling that the yarns at issue are spun to make braided packaging material, and since they are the only input to packaging material, the yarn has the essential character of finished packing material); NY N300749 (Oct. 18, 2018) (applying GRI 2(a) to classify an incomplete elevator from China under the HTSUS subheading for elevators and other forms of lifts); HQ 554581 (July 2, 1987) (applying GRI 2(a) to classify a motherboard as a data processing machine although as imported it could not function).

[6] CA 1330 alone might properly be considered a "catalytic preparation."

One indicator of essential character is if something is the principal active part of the finished article. *See e.g.* HQ 956226 (Sep. 13, 1994). CA 1330 is the main ingredient of the reaction accelerator or supported catalyst system. The catalyst system has two active ingredients, CA 1330 (98%) and metallocene (2%) on a supported catalyst. Statement of Material Facts at ¶ 28.

Moreover, the CA 1330 plays a continuing role in the supported catalyst system. After activating the metallocene, the MAO in the CA 1330 serves as an anion, a weakly negatively charged species, whose presence is necessary to stabilize the cation metallocene, so it has a catalytic center. *See* Krause Decl. at ¶ 37; Krause Supp. Decl. at ¶¶ 4–5. The presence of the CA 1330 enables the metallocene to act as the catalytic center for the olefin polymerization. *Id.*

Further, unlike metallocene, the CA 1330 plays multiple critical roles in the catalyst system. CA 1330 performs four functions:

(1) Alkylates the metallocene compound. This means that the MAO in CA 1330 exchanges two methyl groups with two chloride groups on the metallocene. *See* Krause Decl. at ¶ 36(a).

(2) Extracts one alkyl (formally a methyl anion) group from the metallocene to generate an active cation on the metallocene. The metallocene is activated only once by CA 1330. *Id* at ¶ 36(b).

(3) Acts as a bulky, inert anion to the highly reactive transition metal cation. *Id* at ¶ 36(c). In this regard, the presence of the newly generated CA 1330 anion provides the required charge balance for the metallocene cation.

(4) Scavenges impurities from the polymerization reactor. *Id* at ¶ 36(d).

CA 1330's multiple functions in creating and maintaining the catalyst are facts that reinforce it being the essential character of the MAO-Metallocene supported catalyst system. Without the presence of CA 1330, there is no polymerization reaction. *See generally* Krause Decl. at ¶ 37.

Finally, the fact that there is only one use of CA 1330, as the main component of a specific supported catalyst system used to make polyolefins, further confirms that it provides the essential character of this catalyst system. In contrast, there are other uses for metallocene. *See generally* Steffen Bade Ph.D., *Metallocenes* at Abstract, Patty's Toxicology, https://doi.org/10.1002/0471125474.tox024.pub3. The metallocene is only the catalytic center, and this is because of the CA 1330.

In sum, CA 1330 provides the essential character of the supported catalyst system.

Contrary to the Government's contention, LANXESS is not asking the Court to skip an analysis of the heading's terms under GRI 1. Rather LANXESS is applying the GRIs as they are intended to be applied. Doing so confirms that CA 1330 falls under the heading terms "reaction accelerators" and also "catalytic preparations." It would be illogical for the Court to rule that the essential component of a supported catalyst would fall anywhere else besides 3815. The Government's argument that the Court should fail to consider the inferior subheading and basically read "supported catalyst" entirely out of heading 3815, HTSUS, is contrary to basic principles of statutory construction. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000).

**C.    The Government's definition of a "reaction accelerator" is unnecessarily limited.**

The Government's interpretations of various terms at issue are unreasonably and improperly narrow. This observation applies to the Government's position as to what is considered a "reaction accelerator."

First, there is nothing in the HTSUS or the Explanatory Notes to support the Government's position that heading 3815, HTSUS, only covers merchandise that contains the catalytic center. The Government argues that, since CA 1330 does not act as the catalytic center for the polymerization process, CA 1330 cannot be a "supported catalyst." Def. Br. at 16. The catalytic

15

center is the specific location on the molecule where the reactions that the catalyst system is meant to accelerate occur. Krause Dep. at 35:2–6. Whether CA 1330 becomes the catalytic center of the supported catalyst system is irrelevant to its proper classification because it is the main part of the catalyst system and creates and sustains the catalytic center. Heading 3815 covers "preparations which initiate or accelerate certain chemical processes." EN 3815. There is no indication that for the imported article to be classified in heading 3815, HTSUS, it must be the catalytic center of the finished good. Instead, the Explanatory Notes say, "[t]his heading covers preparations which initiate or accelerate certain chemical processes." EN 3815. "Products which retard these processes are not included." *Id.* In other words, this heading refers specifically to catalysts that accelerate the rates of reactions and other chemical initiators.

Similarly, there is no indication that a "catalyst activator," which is how the Government attempts to characterize CA 1330, would not fall under heading 3815, HTSUS. As explained herein, CA 1330 plays multiple roles in the catalyst system, including activation of the metallocene. As such, CA 1330 is a reaction accelerator or a catalytic preparation under any reasonable interpretation of those terms. Defendant's Statement of Material Facts Not in Dispute at ¶ 15.

Finally, the Government and their expert, Michael Bohenek argue that reaction accelerators are limited to accelerators used in the vulcanization of rubber. Again, there is no basis for this claim. In fact, the Explanatory Notes for heading 3815, HTSUS, clearly refute this alleged narrow definition. Contrary to the Government's contention, the Explanatory Notes refer specifically to rubber vulcanization saying that, "accelerators for use in the vulcanization of rubber" are excluded. *Id.* Thus, the Government's proposed narrow definition of accelerator is clearly incorrect.

**D.    CA 1330 is specifically classified at subheading 3815.19.00.**

Having proven that CA 1330 is within the scope of heading 3815, HTSUS, we move to the specific tariff provision within the heading. In this regard, CA 1330 should be classified under item 3815.19.00, HTSUS. Heading 3815, HTSUS, is divided into "Supported Catalyst" and "Other" articles within the scope of the heading. As relevant to the classification of CA 1330, item 3815.19.00, HTSUS, covers "reaction accelerators" or "catalytic preparations" that are more specifically "supported catalysts" (but do not contain nickel or precious metals or their compounds as the active substance.) *See* 3815.11.00, HTSUS and 3815.19.00, HTSUS. The Explanatory Notes to 3815.19, HTSUS, explain that this subheading covers preparations that are composed of active substances deposited on a support or mixtures with a basis of active substances. EN 3815.

The GRIs are reapplied at the subheading level after they are applied at the heading level. GRI 6, HTSUS. Here, again, both GRI 1 and 2(a) are relevant to the classification of CA 1330. As explained above, CA 1330 should be classified under 3815.19.00, HTSUS because it has the essential character of a supported catalyst.

In this instance, the Explanatory Notes to heading 3815, HTSUS, are instructive as to the interpretation of "supported catalyst." Customs and this Court have recognized the role of the Explanatory Notes in interpreting the terms of the tariff classification of imported merchandise. *Degussa Corp. v. United States*, 508 F.3d 1044, 1047 (Fed. Cir. 2007) (citing *Motorola, Inc. v. United States*, 436 F.3d 1357, 1361 (Fed. Cir. 2006)). The Explanatory Notes for heading 3815, HTSUS, provide as an example of what should be classified as a supported catalyst under heading 3815, HTSUS, the "Ziegler or Ziegler-Natta types." EN 3815. Like the catalyst system made using CA 1330, a Ziegler-Natta catalyst is a catalyst system composed of two components on a support. Important to the Court's analysis, the Ziegler-Natta system components cannot be combined until

ready for use, which is after importation. Krause Decl. at ¶ 47. Specifically, in olefin polymerization using the Ziegler-Natta system, the two components and support are separately added and thus do not become active until combined inside the polymerization reactor. *Id*. When using the Ziegler-Natta catalyst for olefin polymerization, a titanium compound, a magnesium chloride support and triethyl aluminum are introduced separately into the olefin reactor. Krause Decl. at ¶ 27. In the reactor, the titanium compound is activated by the triethyl aluminum, and the result of this interaction is that the titanium compound becomes catalytically active. *Id.* Whether each of these two compounds are called catalysts or co-catalysts, the Explanatory Notes instruct that they both should be classified as supported catalysts under heading 3815, HTSUS, (unless specifically classified elsewhere such as chapter 28 or 29 as a chemical). Otherwise, the Explanatory Notes comment as to item 3815.19.00, HTSUS, covering the Ziegler-Natta catalyst system would make no sense. Moreover, this interpretation is consistent with industry practice because U.S. made products like CA 1330 have routinely been exported under 3815.19.00 as supported catalysts. Krause Decl. at ¶ 19. Given that the Explanatory Notes explain that the components of a Ziegler-Natta catalyst system are classified as supported catalysts in heading 3815, HTSUS, unless specified elsewhere, and given that CA 1330 is not specified elsewhere, it must be classified under heading 3815.19.00, HTSUS.

For reasons outlined in LANXESS's Motion for Summary Judgement and above, CA 1330 has the essential character of a supported catalyst and should be classified under heading 3815.19.00, HTSUS. LANXESS Br. at 9–16.

**E.    The Court should not allow the Government to amend its complaint to add a counterclaim or defense.**

The Government's attempt to add a counterclaim or add a defense that CA 1330 is classified under HTSUS heading 3824 in a motion for summary judgement is procedurally and substantively incorrect.

### 1.    The Government's effort to add a new counterclaim or defense at this late stage of the litigation is untimely.

Procedurally, "parties cannot amend their complaints through briefing." *Gwazdavsaks v. Tharp*, 2020 U.S. Dist. LEXIS 104298, at *12 n. 7 (W.D. Va. June 16, 2020) (internal citation removed). Thus, for the Government to assert a counterclaim or defense, the Government must amend its answer. *See* USCIT R. 13 (requiring that a counterclaim be in a pleading); USCIT R. 8(d) (requiring that the party include affirmative defenses in its pleadings).[7] USCIT Rule 15 governs when a party may amend its pleadings. Under USCIT Rule 15, a party may amend its pleading once as a matter of course no later than 21 days after serving the pleading, with the other party's consent, or with the Court's leave. USCIT R. 15(a). LANXESS has not consented to an amendment, and, as the Court knows, CIT rules state that the Court will only grant leave to amend when justice so requires. USCIT R. 15(a)(2).

Assuming the Government were to move for leave to amend its answer, the Government would need to explain why such amendment was not the result of "undue delay" or that the amendment would not result in "undue prejudice to the defendants." *Whitest v. Crisp. Cnty Ga.*

---

[7] The Court can look to other Federal Courts' decisions on the Federal Rules of Civil Procedure to interpret the Court of International Trade's own rules of procedure. *Tomoegawa (U.S.A), Inc. v. United States*, 15 C.I.T 182, at 185–86 (Ct. Int'l Trade 1991) (citing USCIT R. 1; *Zenith Radio Corp. v. United States*, 823 F.2d 518, 521 (Fed. Cir. 1987) ("Since the Rules of the Court of International Trade mirror the Federal Rules of Civil Procedure, it is without question that this court may look to the decisions and commentary on the Federal Rules in the interpretation of its own rules.")

*Bd. of Educ.*, 2021 U.S. Dist. LEXIS 192353, at *3 (M.D. Ga. Aug. 20, 2021) (internal citation omitted).

Any request by the Government to amend its complaint would require the Court to consider when the Government first acquired knowledge of the facts and circumstances that form the basis of its proposed classification. *Tomoegawa (U.S.A), Inc. v. United States*, 15 C.I.T 182, at 186 (Ct. Int'l Trade 1991). The Government is obliged to submit its alternative classifications within a reasonable time upon acquiring the necessary knowledge. *Id.* Here, the Government learned of the facts necessary to submit the alternative classification in December 2024. In its responses to LANXESS's interrogatories, dated December 20, 2024, the Government explained its position that CA 1330 falls under heading 3824, HTSUS. *See* Ex. B to Def. Br., Resp. No. 17. The Government acknowledges that this response expressed its "view of this classification of the imported merchandise (*i.e.*, subheading HTSUS 3824.99.2[9]), and that [the Government was] no longer pursuing classification under heading 3208, HTSUS." Def. Br. at 9. Now, nine months after this change of position, after the close of discovery, and after LANXESS has filed its Motion for Summary Judgement, the Government seeks to tacitly amend its complaint to assert the alternative classification defense. The Court should not allow it.

### 2.    *The Court cannot order the duty payment that the Government seeks.*

In addition to requesting that CA 1330 be classified under sub-subheading 3824.99.29, the Government asserts that "the Court should order reliquidation at the applicable duty rate and payment of the outstanding duties, fees, and interest." Def. Br. at 10.[8]

---

[8] Goods imported under 3208.90.0000, HTSUS are subject to a duty rate of 3.2%. Goods imported under 3924.99.29, HTSUS are subject to a duty rate of 6.5%. 3924.99.29.

First, the courts have found that there is no basis in law for a counterclaim in classification disputes like this one. Instead, the courts have said that an alternative classification must be used as a defense. *See generally Second Nature Designs, Ltd. v. United States*, 654 F. Supp. 3d 1301 (Ct. Int'l Trade 2023); *Maple Leaf Mktg., Inc. v. United States*, 639 F. Supp. 3d 1363 (Ct. Int'l Trade 2023); *Cyber Power Sys. (USA) Inc. v. United States*, 586 F. Supp. 3d 1325 (Ct. Int'l Trade 2022).

Second, CA 1330 is subject to a binding CBP ruling, and the entries benefit from this treatment. LANXESS imported CA 1330 under item 3208.90.0000, HTSUS. ECF No. 8 at ¶ 13. LANXESS filed two protests against the classification of CA 1330 under this heading. *Id.* at ¶ 14. These protests requested further review. *Id.* (citing ECF No. 7-1, at 15, 17). CBP denied the two protests and further review. ECF No. 3-4, 9–10. CBP denied the two protests based on New York Ruling Letter (NY) N128896 (November 10, 2010). The protest denial merely stated: "Prior Ruling - Ruling N128896 (Chemtura Corporation - 11/10/2010) places Methylaluminoxane and Toluene in 3208.90.0000 as entered." *Id.* at 9-10. The Center of Excellence and Expertise ("CEE") forwarded the protest to CBP Headquarters ("HQ") for further review, but since the CEE took more than 60 days, CBP HQ denied the application to set aside the denial of the application for further review. ECF 7-2 at 72–74.

As the Government has noted in its motion and statement of facts, LANXESS acquired Chemtura, and, thus, CA 1330 is the same product as the subject of the ruling; only the name was changed by LANXESS. The fact that LANXESS's imports of CA 1330 are subject to binding ruling limits the actions CBP may take in response to a reclassification to a higher rate. Under 19 U.S.C. 1625, CBP may only modify or revoke a ruling that has been in existence for over 60 days by following a public notice and comment process, and "the final ruling or decision [of such

process] shall become effective 60 days after the date of its publication." 19 U.S.C. 1625(c). The legislative history for this provision confirms that its purpose was specifically to "provide 'assurances of transparency concerning Customs rulings and policy directives through publication' of Customs' rulings or decisions that modify or revoke an existing ruling or decision.'" *Sea-Land Service, Inc. v. U.S.*, 239 F.3d 1366, 1373 (Fed. Cir. 2001), *quoting* H.R. Rep. No. 103-361, at 124 (1993), *reprinted in* 1993 U.S.C.C.A.N. 2551, 2674).

CBP has published regulations to implement 19 U.S.C. 1625, which require:

> Before the publication of a ruling which has the effect of changing an established and uniform practice [which includes a ruling] and which results in the assessment of a higher rate of duty within the meaning of 19 U.S.C. 1315(d), notice that the practice (or prior ruling on which that practice was based) is under review will be published in the FEDERAL REGISTER and interested parties will be given an opportunity to make written submissions with respect to the correctness of the contemplated change.

19 C.F.R. 177.10(c). The regulation further provides:

> If the ruling involves merchandise, it will be applicable to all unliquidated entries, except that a change of practice resulting in the assessment of a higher rate of duty or increased duties shall be effective only as to merchandise entered for consumption or withdrawn from warehouse for consumption on or after the 90th day after publication of the change in the FEDERAL REGISTER.

19 C.F.R. 177.10(e). A related regulation, 19 C.F.R. 177.12, likewise provides that an interpretive ruling, if found to be in error, may be modified or revoked by a new interpretive ruling, but the provision requires that the modification or revocation must be carried out in accordance with notice procedures.[9]

Among exceptions to these notice and comment requirements is the rendering of a judicial decision which has the effect of overturning a CBP ruling. 19 C.F.R. 177.12(d)(iv). The CBP

---

[9] Notably, 19 C.F.R. 177.12(e)(2)(ii) allows that, for entries for which liquidation is not yet final, an importer may choose to have a revocation immediately effective on the date of publication of that revocation. This language should allow an importer to take advantage of a favorable change immediately upon publication; no corollary allows CBP to move up the effective date of a change in its favor.

regulation at 19 C.F.R. 152.16 provides the following rules for the application of judicial changes in classification:

> (a) ***Identical merchandise under decision favorable to Government.*** The principles of any court decision favorable to the Government shall be applied to all merchandise identical with that passed on by the court which is covered by **unliquidated entries,** whether for consumption or warehouse.
>
> \*\*\*
>
> (c) ***Higher rate.*** If a court decision overruling a protest contains a definite statement that a higher rate than that assessed by the port director or Center director before January 19, 2017, or the Center director on or after January 19, 2017, was properly chargeable, such higher rate shall be applied to all merchandise, whether identical or similar to that passed on by the court, which is affected by the principles of the court's decision and **which is entered or withdrawn for consumption after 30 days** from the date of the publication of the court's decision in the Customs Bulletin.
>
> \*\*\*
>
> (e) ***Other decisions adverse to Government.*** Unless the Commissioner of Customs otherwise directs, the principles of any court decision adverse to the Government … **shall be applied to unliquidated entries and protested entries which have not been denied in whole or in part** and in which the same issue is involved as soon as the time within which an application for a rehearing or review may be filed has expired without such application having been made . . . .

19 C.F.R. 152.16 (emphasis supplied).

According to these rules, even if the Court classified CA 1330 under heading 3824, HTSUS, it may not order reliquidation at the higher duty rate for entries that have already been liquidated, including those subject to pending protests. Pursuant to its regulations, CBP may only charge the higher duty rate for CA 1330 entries that are imported or withdrawn for consumption 30 days after the Court's decision is published in the Custom's Bulletin. 19 C.F.R. 152.16(c). The Government's requested remedy violates CBP's own rules because the remedy seeks reliquidation

at a higher duty rate and payment of outstanding fees. Def. Br. at 10. The Court should not grant this relief.

## V.    CONCLUSION

Classification of CA 1330 under 3815.19.00, HTSUS is the only appropriate result. CA 1330 is used exclusively as reaction accelerator or a catalytic preparation and has the essential character of a supported catalyst.

For the reasons set forth above, Plaintiff respectfully requests that the Court issue summary judgment in its favor, order CBP to reliquidate the subject entries with classification at 3815.19.00, HTSUS, and order CBP to refund excess duties paid with interest as provided by law.

Respectfully Submitted,


*/s/Kenneth G. Weigel*

Kenneth G. Weigel
Brian Frey
Lian Yang
Robert Hawes
ALSTON & BIRD LLP
950 F St N.W.
Washington D.C. 20004
(202) 239-3490
Brian.Frey@alston.com
*Counsel to LANXESS*

Dated: October 31, 2025

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to the Standard Chambers Procedures of the U.S. Court of International Trade, this Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment contains 7242 words, as determined by Microsoft Word. This word count is within the limit of 14,000 words set forth in Judge Choe-Groves's Standard Operating Chambers Procedures Rule 2(B)(1)(a).

*/s/Kenneth G. Weigel*
Kenneth G. Weigel
Brian Frey
Lian Yang
ALSTON & BIRD LLP
950 F St N.W.
Washington D.C. 20004
(202) 239-3490
Brian.Frey@alston.com
*Counsel to LANXESS*


Dated: October 31, 2025

## CERTIFICATE OF SERVICE

I certify that on October 31, 2025, I served a copy of the attached Motion for Summary Judgment and of the attached Memorandum of Points and Authorities in Support of Plaintiff's Response to the United States' Cross Motion for Summary Judgement with the Clerk of Court using the CM/ECF system, which will send notice to all counsel of record.

*/s/Kenneth G. Weigel*
Kenneth G. Weigel
Brian Frey
Robert Hawes
ALSTON & BIRD LLP
950 F St N.W.
Washington D.C. 20004
(202) 239-3490
Brian.Frey@alston.com
*Counsel to LANXESS*

Dated: October 31, 2025

## <u>DECLARATION OF AUTHENTICITY</u>

I, Kenneth G. Weigel, counsel for Plaintiff, LANXESS Corporation, certify under penalty

of perjury that all documents attached to this Memorandum are accurate and authentic.

*/s/Kenneth G. Weigel*
Kenneth G. Weigel
Brian Frey
Robert Hawes
ALSTON & BIRD LLP
950 F St N.W.
Washington D.C. 20004
(202) 239-3490
Brian.Frey@alston.com
*Counsel to LANXESS*


Dated: October 31, 2025